(100 South. 528)

No. 25874.

## SILVA v. MIRAMON.

(May 5, 1924.)

*(Syllabus by Editorial Staff.)*

1. **Divorce** ⬤➟130 — **Evidence held insufficient to establish cruelty of wife.**

   Evidence *held* insufficient to establish cruel treatment and outrages by wife warranting decree for separation from bed and board.

2. **Divorce** ⬤➟46—**Wife's expression of indignation at husband's conduct, indicating abandonment, may not be assigned as excessive cruelty.**

   Where husband so behaves as to give wife grounds for believing he has abandoned her for another, he cannot complain that she should voice her indignation and give vent to some feeling, and her conduct on such occasion cannot be assigned by him as "excesses, cruel treatment, or outrages * * * of such a nature as to render their living together insupportable," under Rev. Civ. Code, art. 138.

Appeal from Civil District Court, Parish of Orleans; Hugh C. Cage, Judge.

Suit for separation from bed and board by Albert A. Silva against Rose E. Miramon, wherein defendant reconvened for divorce. From decree of dismissal as to both parties, plaintiff appeals. Affirmed.

Joseph D. Kiernan, of New Orleans, for appellant.

Prentice E. Edrington, Jr., of New Orleans, for appellee.

By Division C, composed of OVERTON, ST. PAUL, and THOMPSON, JJ.

ST. PAUL, J. On April 16, 1920, Ambrose Morel filed suit against his wife, Wilhemena Sharp, charging her with *crim. con.* with this plaintiff, to wit, on April 12, 1920. On December. 15th following, he therein obtained judgment of divorce against her. Thereafter the wife resumed her maiden name.

[1] With the merits of that case we are not concerned; suffice it to say, however, that Morel and his wife were then living apart; that plaintiff was at the wife's home for quite a while that day; that both Morel and his ex-wife were called as witnesses in this case; that *she* denies having been guilty of such misconduct; that *he* (Morel) claims to have been *an eyewitness* to the alleged occurrence. For *all this* has a direct bearing on the reasons for judgment assigned herein by the trial judge; to which we will come hereafter.

## I.

On September 13, 1921, plaintiff brought this suit for separation from bed and board, alleging: That he has always conducted himself as a good and dutiful husband; that, on the other hand, his said wife has so behaved herself as to render their living together impossible.

And for particulars thereof he specifies the following, to wit:

(1) That on the morning of April 30, 1920, he left the common residence as usual, and when he returned shortly after noon he found the house locked, and his wife gone; that he repeatedly tried to gain entrance to his house, and to locate his said wife, but was unable to do so.

(2) That on *May 3, 1920*, he again went to his house, where he found his said wife moving out all the furniture, having sold the same; that his said wife made him take away his own clothes, threatening to burn them if he failed to do so. (He does *not* allege, but he *testifies*, that on May 3d or 7th he took up his permanent residence at the home of Mrs. Sharp, aforesaid.)

(3) That his said wife then charged him before the criminal court with failure to support her; and that, despite the fact that he had at no time failed to support his said wife and was always ready and willing to do so, he was ordered to pay her alimony at the rate of $8 per week; which was *afterwards increased* to $9 per week (Italics ours).

(4) That on February 4, 1921, his said wife accosted him on the corner of *Dumaine and Broad* streets (in the city of New Orleans) and cursed and abused him in the presence of a large number of people, calling him vile names; and that she struck and beat him in the face and head, greatly humiliating him and causing him great shame and pain.

(5) That his said wife has an ungovernable temper; that whilst he lived with her (from the time of their marriage until April 30th aforesaid), she continually displayed her anger towards him, and would give way to her violent temper, thus rendering their living together unsupportable.

## II.

The *fifth* specification above set forth seems to have been thrown into the petition merely *for good measure*, for there is not a

word on that subject in the whole testimony. The *third* specification, aforesaid, answers itself.

### III.

As to the *first* and *second* specifications, plaintiff testifies as follows:

"Question: You allege that on April 30, 1920, you returned to your residence and could not get in. Will you explain that?

"Answer: I left home about a quarter to 12 that day, and Mrs. Silva said she was going to follow me where I was going; and I told her I did not care. She came on out in the street behind me; and I returned about 2:15 to go to work, but the house was locked, and I could not get in to get my (motorman's) uniform; and so I reported to the barn that I was sick. Three times that day I had to report sick; and later, about 8 o'clock, the house was still locked, and I could not get in; and I went to a friend and borrowed a key from him and tried to open the front door but could not. And so I went out to the lake with some of the boys and stayed out there; I came back about 10 o'clock, and the house did not have any (sic)—I did not have any money or clean clothes, and so I borrowed $20 from a friend because I could not get in to get clean clothes. Then I went out to a place on Rochebalve street; and then I came back the next day, and I found Mrs. Silva there. She had sold everything in the house, and all my clothes were bundled on the floor; and she told me to 'dig out.' All the money she had taken, and had destroyed some of the insurance papers and birth papers, and everything she could get her hands on; and she told me that my army discharge had been burned. * * *

"Question: * * * That morning (April 30th) did you tell Mrs. Silva that you were going out with Mrs. Sharp, and for Mrs. Silva to spend the day at her mother's?

"Answer: No, sir.

"Question: When was the furniture moved out of that house?

"Answer: I think it was about three days later. * * *"

On the other hand, the defendant's version of that occurrence is as follows:

"Question: * * * What happened that day (April 30th)?

"Answer: * * * My husband got up and told me he was going to court with Mrs. Sharp; that her husband had caught her at something, and was going to stop paying her alimony;

and he (witness' husband) was going to prove that she was a good woman; that she was not a bad, immoral woman, and he was going to court and try to help her. And I says: 'Albert, are you going to lie for her? * * * Do you think (realize?) you are telling those things to your wife?' * * * And he says: 'I am going to help this woman, I am going to try to make a lady of her. You go to your mother's house and spend the day, and I will come and get you there.' * * *

"That evening I went to his car, and as it passed he was not on it. That was the first time he had ever laid off without my knowing it. I went home and saw his uniform in its usual place; he had not been there, and then I went back and told my mother about it; and that night my sister came and slept with her baby. He did not show up (the next day). * * * I did not know what to do; and then I went to the juvenile court, but they told me that if (as) I had no children I could not get anything. (Thereupon she went to see an attorney at law, who advised her that, if she had no means to store the furniture, she should sell it, as otherwise the landlord would seize it; and she did so.)"

Which of these two versions is the more likely will readily be seen from the following testimony given by plaintiff himself:

"Question: How long have you known Mrs. Morel?

"Answer: I guess a little over two years.

"Q. When did you meet her? A. When I ran out on the street car, the Paris avenue line.

"Q. Were you introduced to her by any one? A. No.

"Q. How did you come to speak to her? A. The car went to the end of the line, and it was raining very hard; and she says to the conductor: 'Will you tell me whether this car goes back up St. Peter street; I am a stranger and don't know this car line very well.' And he says: 'Yes. * * * Where are you from?' She says: 'From Mandeville.' I says: 'I have relatives over there, Joseph W. Sharp, my grandfather, and lots of cousins.' She says: 'I know them all; my name is Sharp.' And that is the way I got to knowing her. I asked her mother's name, and she says, 'Anna Sharp;' and I says, 'That is also my mother's name. I would like to meet your mother.' And she invited me to come to the house; and I went there at the next (sic)—

"Q. How long after that? A. I went there very often.

"Q. What do you call very often? A. Nearly every week.

"Q. How many times a week? A. I could not say.

"Q. Did you ever go out with Mrs. Morel? A. Yes, very often."

All of which requires no further comment. But it may not be amiss to say that whilst defendant reconvened for a divorce on the ground that plaintiff was the co-respondent in the Morel-Sharp divorce suit, nevertheless she has not appealed from the judgment of the lower court dismissing her demand as in case of nonsuit; nor has she answered the appeal herein taken by plaintiff, except to ask that the judgment of the trial court, rejecting *his* demand, be affirmed. And the reason appears from her testimony as follows:

"Question: * * * Why did you wait until he filed suit against you for separation * * * to make these allegations to get your divorce? * * * Can you explain that? Answer: Well, when I first went to the criminal court, Mr. Luzenberg advised me not to get a divorce, just to get alimony and keep up with him; it was not until (September) 1921, that I received the separation notice, and it was since July, 1920, that I had been getting alimony. I did not think of the divorce; I was just getting alimony, and that is all.

"Q. Did Mr. Luzenberg advise you also to collect alimony in the divorce suit; that you could get it in the judgment? A. Mr. Daly told me it had been done (prayed for); that I was in needy circumstances.

"Q. You are asking for alimony in this suit? A. Yes, sir. (The prayer is for alimony 'after due proceedings had,' not for alimony pendente lite.)

"Q. So it is really the alimony which kept you from making these charges until now? A. No, * * * I did not want a divorce; I want my husband."

### IV.

As to the *fourth* and only remaining specification, it may be said that plaintiff and *Mrs. Sharpe*, aforesaid, give one version of it, whilst defendant and her sister, Mrs. Clayton Smith, give another. According to

these last, plaintiff was the aggressor throughout, in both word and deed. So that the testimony is two to two; if we simply *count the witnesses.* There is, however, an attempt to further corroborate plaintiff's testimony by that of one Hausen, who claimed that he was the conductor of the car on which the parties rode from Canal and Dauphine street to Broad and Dumaine, the scene of the *fracas.* But as this witness was *not* called to testify before the criminal court, in the trial of the charge of assault and battery which plaintiff preferred against his wife, and of which she was acquitted, we surmise that his presence at this time is rather in the nature of an afterthought on the part of the plaintiff to overcome the aforesaid parity in the number of witnesses, and upon the assumption that the court (this court) would appraise all the witnesses as equally credible; *which we do not.*

But for the purpose of this case it will suffice quite as well to let plaintiff tell of the occurrence in his own way; which he did as follows:

"Question: Mr. Silva, you allege that on February 4, 1921, at the corner of Dumaine and Broad, your wife assaulted you. Will you state to the court exactly what occurred? Answer: I was walking on Canal street (which is the main thoroughfare and central boulevard of the city of New Orleans) with Mrs. Sharp about 4:30 in the afternoon, when we encountered Mrs. Silva and her sister, and they immediately began to follow us around to different places and to pass remarks. We continued going out different streets, trying to get away from them; and about half an hour afterwards they were still behind us. We walked down Canal street to get away from them; we went down to get a street car, and we found them both by the Maison Blanche Arcade; and as we walked up to the left-hand corner of Dauphine street, they came out. There was a Broad Street car coming at the time, but we stayed there and let it pass; the Bayou St. John car came, then another Broad car came, and I decided that we would take this Broad car and go on out; and as we walked out she began cursing and abusing me for everything she could think of, and continued to use the

abuse. We were all getting into the car, Mrs. Sharp and the other people were getting in, and she and her sister got in and walked up to the forward part of the car. They continued their slander out as far as Broad street, and when we got to Broad street, I decided to get off; and as we were getting off of the back of the car it started to go across Broad street; and she and her sister got out at the front end of the car, and began abusing and insulting me. And I asked: 'What do you mean? I am not worrying you a bit.' And then the same thing kept on, crying for alimony; and I says: 'You are getting it;' and she says: 'If you want to tell me anything, tell it to me;' and she kept on using vile language that she had used on Canal street. When I said that to her, she slapped me in the face. I tried to grab her, and two fellows jumped out of the car, and they dumped me and crushed me up; and I had a scar across my face with a hat pin. I am sure one was Mr. Morel from the criminal court, and the other gentleman was a clerk, and those scars were over my face; and then I went down the next morning and filed an affidavit against my wife."

From the foregoing it might perhaps be thought that Mrs. Sharpe had left the car before it reached the scene of the difficulty. But *not so;* for she testifies as follows:

" * * * When it (the car) turned out at Dumaine and Broad, Mr. Silva jumped out before the car stopped, and when I got out there was two men holding him; and they had him by the hair, and she scratched his face up; and then I went on home. * * *

"Q. Did you all see Mrs. Silva strike her husband? A. Yes, sir; I saw her beat him on the head, pulling his hair and scratching his face.

"Q. Do you know whether Mr. Silva struck his wife at any time? A. No, sir; there were two men holding Mr. Silva, and she was striking him.

"Q. Who stopped the fight? A. I don't know. I went on home.

"Q. When you left, they were still having trouble? A. Yes. * * *

"Q. The first time you saw Mr. Silva after he got out of the car was when the crowd had him, holding his arms; is that correct? A. Yes.

"Q. You did not see what took place before that? A. No, because I was just getting out of the car."

## V.

Such was the record upon which the district judge, commented as follows:

"I do not think the plaintiff comes into court with clean hands. Here we have a woman accused in this court of having criminal relations with this man, and yet he associates with her openly. That is enough to set a wife half crazy, I imagine. ·

"Whatever indiscretions the wife (this defendant) has committed are largely (wholly?) the result of his (this plaintiff's) own actions.

"She has failed to prove her reconventional demand to the satisfaction of the court; but she has certainly raised tremendous suspicions in the mind of the court; and I imagine that *her* suspicions are some forty times as great as mine.

"I cannot give her judgment on the reconventional demand, and must dismiss it as in case of *nonsuit*.

"But the husband's suit for separation from bed and board will be dismissed at his cost."

## VI.

We have said before that we do not think the witnesses in this case were all equally credible. We think it possible, perhaps likely, that the outraged wife may have been first to give rein to her pent-up feelings, and voice her just indignation. On the other hand, the fact that plaintiff "jumped out before the car stopped," leaving his companion behind; and that strangers thought it necessary to "jump out of the car" and hold plaintiff's arms when he started to "grab" his wife after she had "slapped his face"— tells much more effectively what did occur, and what *might* have occurred, than the exaggerated testimony of excited witnesses. And our own belief is that plaintiff started to "*grab*" his wife *before*, and not after, she "slapped his face." What followed was only the very natural consequence of a very unnatural condition.

[2] And on the whole we therefore conclude, as did the district judge, that plaintiff's demand should be rejected. Where a husband so behaves as to give his wife just.

ground for believing that he has abandoned her for another woman (as this plaintiff certainly has), he cannot complain that she should voice her indignation at his conduct and give vent to some feeling against him on that account; and her conduct on such occasion. being thus provoked by himself, cannot be assigned by him as "excesses, cruel treatment, or outrages * * * of such a nature as to render their living together insupportable," and thus furnish grounds for a separation from bed and board under R. C. C. art. 138. Let such a husband first mend his own ways, and when this is done, it will then be time to complain of his wife's "*ill treatment*" should she on her part not cease complaining; which, *of course*, she will under such circumstances.

### Decree.

The judgment appealed from is therefore affirmed.